# UNITED STATES DISTRICT COURT

__NORTHERN__ DISTRICT OF __ILLINOIS, EASTERN DIVISION__

UNITED STATES OF AMERICA

v.

JOSE de JESUS ALVARADO-TIZOC, aka "Jose de Jesus Tizoc", "Jose Jesus Alvarado", "Jose Alvarado", and "Chuy"

**CRIMINAL COMPLAINT**

CASE NUMBER: 08CR124

MAGISTRATE JUDGE VALDEZ

FILED FEB 12 2008 MICHAEL W. DOBBINS CLERK, U.S. DISTRICT COURT

I, the undersigned complainant being duly sworn state the following is true and correct to the best of my knowledge and belief. Starting no later than __March 2005__, and continuing until at least __December 2005__, at __Chicago__, in __Cook__ County, in the __Northern__ District of __Illinois__, and elsewhere, defendant did,

conspire with others to knowingly and intentionally possess with intent to distribute and to distribute controlled substances, namely, 1 kilogram or more of mixtures and substances containing heroin, a Schedule I Narcotic Drug Controlled Substance, and 400 grams or more of mixtures and substances containing fentanyl (N-phenyl-N-[1-(2-phenylethyl)-4-piperidinyl] propanamide), a Schedule II Narcotic Drug Controlled Substance, in violation of Title 21, United States Code, section 841(a)(1),

in violation of Title __21__ United States Code, Section __846 and Title 18, United States Code, Section 2__.

I further state that I am a __Special Agent with the Drug Enforcement Administration__ and that this complaint is based on the following facts:

See attached affidavit.

Continued on the attached sheet and made a part hereof: __X__ Yes ___ No

_____
Signature of Complainant

Sworn to before me and subscribed in my presence,

February 12, 2008                at        Chicago, Illinois
Date                                         City and State

MARIA VALDEZ, U.S. Magistrate Judge        _____
Name & Title of Judicial Officer           Signature of Judicial Officer

STATE OF ILLINOIS  )
                   )
COUNTY OF COOK     )

## AFFIDAVIT

I, Ryan J. Rapaszky, being first duly sworn on oath, depose and state as follows:

### I. INTRODUCTION

1. I am a Special Agent of the Drug Enforcement Administration (hereinafter "DEA") and have been so employed for over four years. I have received special training in the enforcement of laws concerning controlled substances. This training consisted of detailed instruction in the areas of drug identification, investigative techniques, criminal law, undercover operations, informant development and handling, physical and electronic surveillance, the authorized interception of wire communications, and debriefing defendants, witnesses and informants, as well as various methods and procedures utilized by drug organizations to illegally import, transport and distribute controlled substances and to launder and conceal proceeds from drug trafficking. I have also been involved in various types of electronic surveillance and in the debriefing of defendants, witnesses, informants, and others who have knowledge of the illegal distribution and transportation of controlled substances.

2. As DEA Special Agent, I have participated in numerous drug trafficking investigations, and have participated in investigations relating to the illegal distribution of controlled substances. Based on my training and experience, I am familiar with the ways in which drug traffickers and their associates conduct their drug-related business, including, but not limited to, their methods of distributing narcotics, their use of telephones, and their use of codes and code words to identify themselves, and the nature of the communications.

1

3. The information contained in this Affidavit is based on my conversations with and review of reports prepared by agents in the DEA, as well as other federal agencies and other law enforcement agents and officers; the results of physical surveillance; agents' interviews of witnesses; agents' review of recordings of conversations intercepted pursuant to Court orders authorizing the interception of wire communications. Since this Affidavit is being submitted for the limited purpose of establishing probable cause as set forth herein, I have not included each and every fact known to me concerning this investigation.

4. This Affidavit is made for the purpose of establishing probable cause in support of a Criminal Complaint charging: JOSE de JESUS ALVARADO-TIZOC, also known as (hereinafter "aka") "Jose de Jesus Tizoc", "Jose Jesus Alvarado", "Jose Alvarado", and "Chuy", with conspiring with others to knowingly and intentionally possess with intent to distribute and to distribute controlled substances, namely, 1 kilogram or more of mixtures and substances containing heroin, a Schedule I Narcotic Drug Controlled Substance, and 400 grams or more of mixtures and substances containing fentanyl (N-phenyl-N-[1-(2-phenylethyl)-4-piperidinyl] propanamide), a Schedule II Narcotic Drug Controlled Substance, in violation of Title 21, United States Code, Section 841(a)(1), all in violation of Title 21, United States Code, Sections 846 and Title 18, United States Code, Section 2.

## II.   OVERVIEW OF THE INVESTIGATION

5. Since approximately the Spring of 2005, the DEA has been investigating a Mexican-based drug trafficking organization (hereinafter "the organization") that obtained large quantities of cocaine, heroin, and fentanyl from Mexico for resale to wholesale customers in Chicago, Illinois, Detroit, Michigan, and elsewhere. During the course of the investigation, agents have obtained

2

historical information from confidential sources, cooperating defendants and intercepted wire communications of ALVARADO and other members of the organization pursuant to court orders, and seized narcotics from members of the organization.

6. Based on the investigation to date, the organization directed ALVARADO to Chicago in or around April 2005 to assume responsibility for the distribution of wholesale heroin and fentanyl, and the collection of narcotics proceeds. Between in or around April 2005 and continuing until December 2005, ALVARADO distributed wholesale quantities of heroin and fentanyl, and collected narcotics proceeds in the Chicago area on behalf of the organization.

### III.  PROBABLE CAUSE FOR REQUESTED COMPLAINT

7. On or about February 22, 2007, a federal grand jury returned a four-count superseding indictment in *United States v. Lutgardo Chavez, Jr., et al.*, 06 CR 138 (Judge Zagel), charging Lutgardo Chavez, Jr. (hereinafter "Chavez") and others for their involvement in the organization that obtained wholesale quantities of cocaine, heroin, and fentanyl from Mexico for resale to customers in Chicago, Illinois, Detroit, Michigan, and elsewhere. Chavez subsequently pleaded guilty to conspiring to possess with the intent to distribute and to distribute cocaine, heroin, and fentanyl. In exchange for his truthful cooperation, Chavez's plea agreement states that the parties have agreed pursuant to Federal Rule of Criminal Procedure 11(c)(1)(C) that Chavez will receive a 51-month sentence.

8. Chavez admitted that between early 2005 and early 2006, he served as courier and broker for the organization, distributing wholesale quantities of cocaine, heroin and fentanyl to Chicago-based and Detroit-based customers of the organization. Chavez further admitted that during that same period of time, he collected narcotics proceeds from Chicago-based and Detroit-based

customers of the organization. Chavez identified Guadalupe Moreno-Soto (hereinafter "Moreno"), who Chavez also knows by the name "Mario Alvarado", and the nicknames "Tio" and "Veterano", as his direct boss.[1] Chavez identified a known photograph of Moreno as the person he knows as Moreno. Chavez described Moreno as being responsible for overseeing the distribution of narcotics and the collection of narcotics proceeds from Chicago-based and Detroit-based customers. Moreno is an indicted defendant in *U.S. v. Chavez*. Moreno is currently a fugitive.

9. According to Chavez, in or around March 2005, Chavez drove Moreno from Chicago to the Los Angeles, California area. While there, Moreno and Chavez met with Felixito Vidana (hereinafter "Vidana"), who Chavez also knows by the nickname "Indio". Chavez identified a known photograph of Vidana as the person he knows as "Indio". Chavez identified Vidana as the leader of the organization. During the drive back from Los Angeles, Moreno told Chavez that Vidana was going to provide Moreno with a new source of heroin. Vidana is an indicted defendant in *U.S. v. Chavez*. Vidana is currently a fugitive.

10. According to Chavez, in or around April 2005, Moreno told Chavez to pick up Moreno's brother, ALVARADO, at Midway Airport. Chavez knows Moreno's brother by the name "Jose Jesus Alvarado" and the nickname "Chuy".[2] Moreno explained to Chavez that ALVARADO

---

[1] According to Bureau of Prisons records, Mario Alvarado entered a plea of guilty in federal court in the district of New Mexico on or about September 15, 1989 to possession with the intent to distribute heroin. The district court sentenced Mario Alvarado to ten years and ten months imprisonment. Mario Alvarado was released from custody and deported to Mexico in or about 1993. I have compared the Bureau of Prisons photograph for Mario Alvarado with the known photograph of Moreno, and have concluded that they picture the same person.

[2] According to Chavez, ALVARADO worked as a "second" during professional boxing matches in Illinois. Records from the Illinois Department of Professional Responsibility (hereinafter "IDPR") reflect that on March 26, 2005, ALVARADO filed an application under the name "Jose Alvarado" with the IDPR to be a "second" during professional boxing matches. In

4

was coming to Chicago to oversee the organization's distribution of narcotics and the collection of narcotics proceeds in Chicago. Moreno told Chavez that ALVARADO was the only person with whom he would entrust the organization's business in Chicago. Moreno indicated that upon ALVARADO's arrival, Moreno would focus on expanding the geographic scope of the organization's business in the Midwest. Chavez picked up ALVARADO from the airport.

11. According to Chavez, ALVARADO stayed at an apartment Chavez was renting in the Logan Square neighborhood (hereinafter "the Logan Square apartment"). Chavez was unable to identify the address of the Logan Square apartment. On a Sunday after the arrival of ALVARADO in Chicago, at Moreno's direction, ALVARADO and Chavez met with Individual A in Chicago. Based on Chavez's prior contact with Individual A, Chavez knew Individual A to be a courier for Darnell Hurt (hereinafter "Hurt"), a Detroit-based customer of the organization.[3] Hurt is an indicted defendant in *US v. Chavez*. In November 2006, Hurt entered a plea of guilty to conspiring to possess with intent to distribute and to distribute controlled substances he purchased

---

the application, ALVARADO listed his date of birth as November 23, 1964. Criminal history records for ALVARADO identify ALVARADO's date of birth as November 23, 1964. In the application, ALVARADO identified his address as 1825 S. California, Chicago, Illinois. Illinois Secretary of State records and Chavez identified 1825 S. Calfiornia, Chicago, Illinois as Chavez's address in March 2005. The application also contains a photograph of ALVARADO Based on the foregoing, I believe ALVARADO arrived in the Chicago area on or before March 26, 2005, by which time ALVARADO had been in contact with Chavez.

[3] In November 2007, Hurt pleaded guilty to conspiring to possess with the intent to distribute and to distribute controlled substances he received from the organization. January 2008, your Affiant met with Individual A in the Detroit area. Individual A voluntarily agreed to speak with your Affiant, and admitted that between April 2005 and February 2006, Individual A served as a courier for Hurt. Individual A estimated that he made between six and eight trips between Detroit and Chicago in the Explorer to pick up narcotics from and deliver narcotics proceeds to the organization on Hurt's behalf. Individual A identified Chavez as one of the Chicago based members of the organization. Individual A has not been arrested and is not actively cooperating with law enforcement.

5

from the organization. Individual A had a blue Ford Explorer (hereinafter "the Explorer")[4] containing a trap compartment in the floor of the rear of the vehicle with him, which ALVARADO and Chavez drove away from the area.

12. According to Chavez, ALVARADO and Chavez drove the Explorer to a location where they activated the trap compartment contained in the floor of the rear of the Explorer. Chavez saw ALVARADO take three bundles of money from the trap compartment and count the bundles inside of the Logan Square apartment. Months later, Chavez saw similar bundles of money, each of which contained approximately $25,000. Chavez and ALVARADO returned the Explorer to Individual A later that same day.

13. According to Chavez, a day or two after picking up money from Individual A, Moreno told ALVARADO and Chavez to pick up heroin from a truck driver near Bollingbrook, Illinois. They did so. More specifically, Chavez drove ALVARADO to the truck stop, where they met with the truck driver. The truck driver said that he needed to be paid his fee of $10,000. The truck driver gave Chavez 7 egg shaped packages that Chavez believed contained heroin.[5] ALVARADO stayed with the truck driver and told CHAVEZ to return to the Logan Square apartment and get the money for the truck driver.

14. Before returning to the Logan Square apartment, Chavez met with Individual A at a seafood restaurant by a mall on Milwaukee Avenue in Chicago. Individual A drove the Explorer.

---

[4] According to the Michigan Motor Vehicle Registration database, Individual A was the registered owner of a 2001 Ford Explorer, bearing VIN 1FMZU73E11ZA43301 between at least the Spring of 2005 through December 2005.

[5] Based on my training and experience, and my involvement in this investigation, I know that heroin is often packaged in egg-shaped packages. In contrast, cocaine is often packaged in brick-shaped packages.

Chavez put the 7 eggs containing heroin into the trap compartment of the Explorer. Chavez then drove to the Logan Square apartment and got $10,000 for the truck driver. Chavez met ALVARADO and the truck driver near Bollingbrook and followed ALVARADO and the truck driver, who were riding together in the truck, to a truck stop in Indiana. Chavez gave ALVARADO the $10,000, who gave it to the truck driver. ALVARADO and Chavez then drove away from the area in the same car.

15. According to Chavez, in the late Spring and early Summer of 2005, Moreno told Chavez that Moreno expected to receive "new heroin" from Vidana for distribution to customers of the organization in the Chicago and Detroit areas. In July 2005, Moreno received a sample of what Chavez termed "new heroin". Moreno delivered the sample to Chavez at Chavez's home at 1825 S. California in Chicago (hereinafter "Chavez's home"). Moreno told Chavez to hide the sample somewhere. Chavez buried the sample in the backyard of Chavez's home.

16. According to Chavez, on or about August 2, 2005, Chavez and Moreno were scheduled to travel from Chicago, Illinois, to Detroit, Michigan, for the purpose of meeting with the Detroit-based customer of the organization, Hurt. According to Chavez, Moreno asked him to get the sample of the new heroin that Chavez had hidden for him. Chavez provided the sample to Moreno in Chavez's home, and saw Moreno pour the powdered sample into plastic wrap. Chavez then walked away from Moreno, and heard Moreno sniffing what Chavez believed to be a portion of the sample. Shortly thereafter, Moreno and Chavez got into a car, and drove toward the expressway. At approximately 1:01 p.m., Chavez called Chicago Emergency Dispatch through

"911" on Target Phone 1[6] and reported that Moreno was not breathing right, and would not wake up. The emergency operator instructed Chavez to get Moreno to an emergency room. According to Chavez, he made this call about five minutes into the trip to Detroit with Moreno.

17.     According to Chavez, Chavez drove Moreno to St. Anthony's Hospital in Chicago. Moreno was admitted to the emergency room on the afternoon of August 2, 2005. Medical records for St. Anthony's hospital reflect that Moreno was admitted to the emergency room exhibiting symptoms consistent with a heroin overdose, was treated with the drug Narcan, and subsequently released from the hospital that same day. A toxicology test administered on Moreno reflected the absence of opiates in his system. Based on my training and experience and my involvement in this investigation, I know fentanyl to be a synthetic form of heroin that does not have an opiate base. I understand that a person suffering from a fentanyl overdose will exhibit symptoms similar to those experienced by person suffering from a heroin overdose. I further understand that medical professionals can successfully treat patients suffering from a heroin or a fentanyl overdose with the

---

[6]On July 22, 2005, Acting Chief Judge James B. Zagel entered an order authorizing the interception of wire communications to and from a cellular telephone assigned telephone number (773) 905-4666, subscribed to by Lutgardo Chavez, 1631 S. California Avenue, Chicago, Illinois 60608, bearing ESN 03610286850, operated on the network of service provider U.S. Cellular, and used by Chavez (hereinafter "Target Phone 1"). The DEA subsequently intercepted wire communications to and from Target Phone 1 for a period of thirty days.

In many of the intercepted calls, coded language was used to conceal the true nature of the telephone calls. At various points in this Affidavit, I have placed in brackets or parenthesis my understanding of what was being said during these calls. My understanding is based up the contents and contexts of the conversations, my experience as a law enforcement officer, the experience of other law enforcement agents and officers in this investigation, and information provided by cooperating sources. The times listed for these calls are approximate. Finally, the summaries below do not include all potentially criminal calls intercepted during the period of interception, or all statements or topics covered during the course of the intercepted conversations. They do not represent finalized transcripts and may not represent the entire conversation that occurred between the identified individuals.

same drug – Narcan.

18. On or about August 3, 2005, Moreno and Chavez traveled by car from Chicago towards Detroit. A group of DEA agents followed Moreno and Chavez from Chicago to the Detroit area. The surveillance team lost track of Moreno and Chavez before they reached Detroit. According to Chavez, Chavez and Moreno reached Detroit and met with Hurt. Hurt was upset because the heroin that Moreno had previously sent to Detroit was black tar heroin of low purity. Hurt wanted to return the black tar heroin to Moreno and Chavez without paying for it. Chavez stated that Moreno gave Hurt a sample of the "new heroin" that Moreno received from Vidana and told Hurt how to mix it with the black tar heroin and lactose. Moreno told Chavez and Hurt that adding the "new heroin" would increase the potency of black tar heroin.

19. After traveling to Detroit, Chavez spoke to Jesus Mario Fajardo-Trujillo (hereinafter "Fajardo"), the broker who coordinated the sale of "new heroin" to the organization, and Co-Conspirator A, the owner of the laboratory at which the "new heroin" was made. Fajardo is an indicted defendant in *U.S. v. Chavez*. Fajardo is currently a fugitive. On or about August 9, 2005, at approximately 12:18 p.m., Chavez told Fajardo, "[T]hey [Hurt and his associates] are mixing, they are mixing it [the 'new heroin' with black tar heroin and lactose]." Fajardo said to Chavez, "[I]t's that I'm with the man, the one I told you that's the owner of those things [the sample of the 'new heroin']." Co-Conspirator A then got on the phone and spoke to Chavez who stated, "Yeah. He was asking if . . . it was working . . . we took it [the 'new heroin' sample] and the person [Hurt] is fucking doing it [mixing the 'new heroin' sample for resale in Detroit]." Chavez further stated "We took it [the 'new heroin' sample to Detroit] and they told me that it was perfect [of good quality]. The dude [Hurt] liked it [the sample of the 'new heroin']." Co-Conspirator A then handed the phone

9

back to Fajardo, who told Chavez, "[W]hat happened is that the guy I pass you to is the owner of The Project [the laboratory manufacturing the "new heroin"]." Chavez told Fajardo, "I'll wait for a reply [from Hurt] in eight days. So we can get the tickets [narcotics proceeds], so they [Hurt and his associates] can start fighting [buying wholesale quantities of 'new heroin']. So, I know for sure that it [the 'new heroin'] worked [was of high quality] when I get the tickets [narcotics proceeds]."

20. Soon after the foregoing call, Chavez spoke with Fajardo on a phone other than Target Phone 1, and told him that Moreno was going to start selling "new heroin" from Vidana. Fajardo stated that he knew the owner of the laboratory (Co-Conspirator A) that was making the "new heroin" and supplying the "new heroin" to Vidana. Fajardo stated to Chavez that he could coordinate a meeting between the owner of the laboratory and Moreno, so that Moreno could buy the "new heroin" directly from the laboratory in Mexico.

21. According to Chavez, in mid-August 2006, Chavez arranged for Fajardo, Moreno and Co-Conspirator A to meet in the San Diego area regarding the organization's purchase of "new heroin" from the laboratory in Mexico. On or about August 13, 2005, at approximately 5:18 p.m., Fajardo left a voice mail message for Chavez on Target Phone 1. Fajardo stated, "Lalo [Chavez], I'm with the guy from The Project [Co-Conspirator A]. I need for you to call me right away, it's urgent. I need for you to pick up, I'm not sure what's going on with you but I've been calling you now for an hour. The guy's [Co-Conspirator A] busy and I need to talk to the Veteran [Moreno]. As soon as you get this, call me please. We're doing that Project [referring to the 'new heroin' laboratory] and it's urgent we talk to you." Based on the evidence developed in the investigation, Fajardo and Co-Conspirator A were trying to get in touch with Moreno regarding the production and distribution of "new heroin".

22. On or about August 14, 2005, at approximately 1:09 p.m., Chavez had a conversation with co-defendant Liliana Arrambide on Target Phone 1. During the call, Chavez stated, "[I]t's just that I cannot find the fucking . . . I can get a hold of my fucking boss [Moreno]. They're [Co-Conspirator A, Moreno, Fajardo] meeting in San Diego [to discuss the organization's purchase of 'new heroin']." Chavez stated, "Well it's that I'm waiting for . . . the main, the main fucking guy [Co-Conspirator A] . . . is over there with Mario [Fajardo]." Chavez went on, "[H]opefully the man over there [Co-Conspirator A] doesn't get impatient. They're [Fajardo and Co-Conspirator A] waiting for my boss [Moreno]. Hopefully he [Co-Conspirator A] doesn't become impatient and everything turns out fine."

23. On or about August 16, 2005, at approximately 4:46 p.m., Chavez spoke to ALVARADO on Target Phone 1. During the call, Chavez told ALVARADO that Moreno had given money to Vidana. Chavez understood the money to be from Hurt's sale of the black tar heroin and the "new heroin" in the Detroit, Michigan area.

24. On or about August 16, 2005, at approximately 6:42 p.m., Fajardo called Chavez on Target Phone 1 and stated, "I'm here with the man [Co-Conspirator A]. We closed on something [a sale of 'new heroin' to the organization] for the end of the month. We [Fajardo, Moreno, and Co-Conspirator A] already came to an agreement and everything. I'm just letting you know not to leave it down. You can ask, ask the man [Co-Conspirator A] for an account [to be sold 'new heroin' on a fronted basis, meaning that the organization would pay for the 'new heroin' after selling it in the United States] here and everything. I mean that's not a problem. I'm going to get situated with my guy [Co-Conspirator A] and you with your guy [Moreno] . . . it's [the quantity of 'new heroin'] something small, little but we're moving forward. Just that the man [Co-Conspirator A] is here and

11

I told him not leave you down, that the... is yours..., more or less, right." Fajardo further stated, "The man [Co-Conspirator A] is here. You can ask him. You're going to find out how he [fronts 'new heroin'] . . . Everything is fine."

25. A confidential source (hereinafter "CS1") identified himself to the DEA in March 2006 as an individual who had information regarding the operation of a clandestine fentanyl laboratory in Toluca, Mexico. CS1 has been providing timely, reliable information to the government since that time.[7] CS-1 identified Co-Conspirator A as a family friend who operated a clandestine laboratory in Toluca, Mexico that made synthetic heroin (fentanyl). According to CS-1, in 2003 Co-Conspirator A and Ricardo Valdez-Torres (hereinafter "Valdez") agreed to invest in a clandestine fentanyl laboratory in Mexico, which they referred to as "The Project". Valdez agreed to act as the "cooker" of the fentanyl. Valdez is an indicted defendant in *U.S. v. Chavez*. Valdez is currently in the custody of the Mexican government. The United States government has formally requested the extradition of Valdez. Between December 2003 and November 2004, CS1 picked up and distributed money on Co-Conspirator A's behalf for "The Project". Co-Conspirator A told CS1 that money was coming from "Indio". CS1 identified a known photograph of Vidana as "Indio". In the late Summer or early Fall of 2005, Co-Conspirator A called CS1 and told him that "The Project" had successfully produced fentanyl so that one kilogram of the fentanyl could be diluted with other substances to make 50 kilograms of street level fentanyl.[7]

---

[7]In March and April of 2006, the DEA shared the evidence it had gathered regarding the organization's operation of a fentanyl laboratory in Tolcua with Mexican law enforcement authorities. On May 21, 2006, Mexican law enforcement authorities raided the Toluca laboratory in Mexico. During the raid, Mexican law enforcement authorities arrested Valdez, and subsequently gave DEA chemists access to the laboratory. DEA chemists recovered a number of samples of suspected fentanyl from inside of the laboratory and determined that the laboratory was a sophisticated fentanyl laboratory capable of producing wholesale amounts of fentynal.

26. According to CS1, in late Summer or early Fall 2005, Co-Conspirator A told CS1 that he would be traveling from Mexico to the San Diego area of the United States to meet with a potential customer of "The Project". When Co-Conspirator A returned from that meeting, Co-Conspirator A told CS1 that a person named "Veterano" (Moreno) had agreed to buy four kilograms of fentanyl each month for a price of $500,000 per kilogram for distribution in the Chicago and Detroit areas. CS1 later met with the individual Co-Conspirator A referred to as "Veterano" and has identified a known photograph of Moreno as "Veterano". The meeting Co-Conspirator A described to CS1 is consistent with the meeting Fajardo discussed with Chavez in the above-referenced telephone calls. I therefore believe that the "new heroin" to which Chavez and his co-conspirators referred was actually fentanyl produced at the laboratory in Toluca, Mexico.

27. According to Chavez, in or about the Fall of 2005, Fajardo, Moreno, and ALVARADO were selling the "new heroin" from the laboratory in Mexico to people in Chicago and Detroit. In or about October 2005, Fajardo instructed Chavez to take another 1 kilogram of the "new heroin" to ALVARADO at an apartment on Halsted Avenue on the North Side of Chicago (hereinafter "the Halsted apartment"). Chavez did so. Shortly thereafter, Moreno explained to Chavez that the 1 kilogram of the "new heroin" was very weak and that ALVARADO only wanted to buy half of the kilogram. ALVARADO explained that the "new heroin" was weak because it had already been mixed with lactose before ALVARADO received it.

28. According to Chavez, after speaking with Moreno, Fajardo and Chavez went to the Halsted apartment, where Fajardo and Chavez met with ALVARADO and a father and son, Co-Conspirator B and Co-Conspirator C, who were buying the "new heroin" from ALVARADO.

13

Chavez identified a known photograph of Co-Conspirator B as the person he knows as the father.[8] While at the Halsted apartment, Chavez saw ALVARADO and others split the 1 kilogram package of the "new heroin" into two separate ½ kilogram packages. CHAVEZ took one of the ½ kilogram packages and two 25 grams bags of the "new heroin". Chavez kept the ½ kilogram package of the "new heroin" and the smaller bags of the "new heroin" in his possession.[9]

29.     According to Chavez, ALVARADO, Co-Conspirator B, and Co-Conspirator C resold the "new heroin" to members of a street gang on the southside of Chicago who resold the "new heroin" at the Dearborn Homes housing project on the South Side of Chicago. According to James Austin, between 1998 and June 2006, Austin sold heroin in the Dearborn Homes housing projects in Chicago.[10] Austin, a leader of the Mickey Cobras street gang, supervised the different heroin lines run from the Dearborn Homes. Austin also ran at least two of his own heroin lines being sold from the Dearborn Homes. Austin's role in running his lines included obtaining the heroin, supervising and sometimes participating in the preparation of the heroin for street sale, and generally supervising the operation of the lines.

---

[8] Law enforcement has not located a photograph of Co-Conspirator C.

[9] According to Chavez, he mixed the ½ kilogram of "new heroin" with black tar heroin and lactose in the laundry room of a co-conspirator's basement. Chavez estimated that he made approximately 4 ½ kilograms of mixtures, which contained the "new heroin". Chavez stated that between December 2005 and February 2006, he sold 3 kilograms of the "new heroin" mixtures to wholesale customers in Chicago, Illinois. In September 2006, DEA forensic chemists collected residue samples from the laundry room where Chavez claimed to have mixed the "new heroin". The samples tested positive for the presence of heroin and fentanyl.

[10] James Austin has pleaded guilty in federal court, *United States v. James Austin, et al.*, 06 CR 451, to conspiring to possess with intent to distribute and to distribute heroin and fentanyl. In exchange for his truthful testimony, the plea agreement for Austin states that the parties have agreed pursuant to Federal Rule of Criminal Procedure 11(c)(1)(C) that Austin will receive a 27-year sentence of imprisonment.

30. According to Austin, in or about late Summer or early Fall of 2005, Austin began obtaining the heroin for his lines from Derrick Campbell, also known as "Dino." Some of Campbell's purported heroin was particularly strong and Austin paid Campbell a higher price for this purported heroin. Austin had his workers mix 10 grams of cutting agent into each gram of the purported heroin to prepare it for street sale. This was more cutting agent that defendant and his workers had ever previously used to cut their heroin. Austin later learned that this purported heroin was instead fentanyl.

31. According to Austin, in the Fall of 2006, Austin learned that Campbell was obtaining his purported heroin from a father and son, Co-Conspirator B and Co-Conspirator C. Austin has identified a known photograph of Co-Conspirator B as the father from whom Campbell was purchasing heroin. On at least one occasion where Co-Conspirator B provided the purported heroin to Austin, Co-Conspirator B was accompanied by a person who Austin knew as "Chuy". I know that "Chuy" is an nickname used by ALVARADO.

32. On February 7, 2008, the DEA learned that ALVARADO was at the Dodge County Correctional Center (hereinafter "the DCCC"). DCCC records and criminal history records for ALVARADO reflect that ALVARADO was incarcerated on an administrative immigration charge awaiting deportation to Mexico.

## IV. CONCLUSION

33. Based on the foregoing, there is probable cause to believe that ALVARADO conspired with others to knowingly and intentionally possess with intent to distribute and to distribute controlled substances, namely, 1 kilogram or more of mixtures and substances containing heroin, a Schedule I Narcotic Drug Controlled Substance, and 400 grams or more of mixtures and substances containing fentanyl (N-phenyl-N-[1-(2-phenylethyl)-4-piperidinyl] propanamide), a Schedule II Narcotic Drug Controlled Substance, in violation of Title 21, United States Code, section 841(a)(1), all in violation of Title 21, United States Code, Sections 846 and Title 18, United States Code, Section 2.

_____
RYAN J. RAPASZKY
Special Agent
Drug Enforcement Administration

SUBSCRIBED TO AND SWORN BEFORE ME
this 12th day of February, 2008

_____
THE HONORABLE MARIA VALDEZ
UNITED STATES MAGISTRATE JUDGE

16